IN THE

## SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW-YORK,

'N NOVEMBER TERM, 1809, IN THE THIRTY-FOURTH YEAR
OF OUR INDEPENDENCE.

———

### LEWIS *against* FEW.

THIS was an action for a *libel.* The declaration contained two counts. The first count charged that the defendant " did, on the 12th day of *March*, 1807, at, &c. wickedly and maliciously publish, and cause and procure to be published, in a certain common and public newspaper, called " *American Citizen,*" a false, scandalous, wicked, and malicious libel of and concerning the said *Morgan Lewis*, governor as aforesaid, containing, among other things, the false, scandalous, wicked, malicious and libellous matter following, of and concerning the said *Morgan Lewis*, as governor of the said state, as

In an action for a libel, the libellous matter, set forth in the plaintiff's declaration, containing the words, " U. States," and in the paper produced in evidence, it was written, *United States;* this variance was held to be immaterial. The court will look to the context, in order to decide whether the variance be material or not.

On a demurrer to the evidence, what facts are deemed sufficient proof of the publication of a libel.

It is no justification of a libel, that the defendant signed the libellous paper, as chairman of a public meeting of citizens, convened for the purpose of deciding on a proper candidate for the office of governor, at an approaching election, and that it was published by the order of such meeting.

A

aforesaid, that is to say, " It is not caprice, a love of change, or light and transient causes which induce us to desire the election of another chief magistrate. We complain of serious injuries, of momentous and aggravated evils. The administration of governor *Lewis*," (meaning the said plaintiff, then governor as aforesaid,) " throughout every stage of its existence, has been marked by a disregard to principles, by hostility towards the republican cause, and with resentment against those who have been its ancient, faithful and distinguished supporters. To establish these accusations, we refer to the events of the three last years." (Being the time wherein the said plaintiff was governor as aforesaid.) " We point to the repeated disorders which have existed, to the intrigues which have been manifested, to the distracted state of our councils, to the total want of harmony among ourselves, and we appeal with confidence and affection to the justice of our republican brethren.

" We solemnly complain against the present governor," (meaning the said plaintiff, then governor as aforesaid,) " and object to his re-election;

" For his" (meaning the plaintiff's) " want of attachment to republican principles, and for his" (meaning the plaintiff) " having formed a coalition with a certain portion of our political adversaries, for the purpose of retaining power, and dividing among themselves the principal and most lucrative offices of the state;" (meaning that the said *Morgan Lewis*, while governor as aforesaid, had formed a coalition with some body or portion of individuals, in order that he might by such corrupt and unlawful means, retain power and continue himself in office, and thereby obstruct the free choice, and voluntary suffrage of the good people aforesaid.)

" For fomenting dissensions in the republican party and endeavouring to produce a separation, thereby adopting the insidious *Macedonian* policy of dividing that he might destroy.

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

" For meeting separately from a large majority of the republican representatives, thereby refusing to acquiesce in the just wishes and rightful determination of that majority.

" For pursuing a system of family aggrandizement;" (meaning thereby, and insinuating, that the said *Morgan Lewis*, contrary to his duty to the said state, and the interests thereof, was perverting the influence of his office aforesaid, to the aggrandizement and promotion of his family.)

" For creating a dangerous personal faction in the state.

" For the appointment of his own son-in-law to the office of recorder of this city," (meaning the city of *New-York*,) " contrary to the earnest remonstrances of our delegation, and against the known wishes of the people, thereby evincing his" (meaning the said plaintiff's) " total disregard of public opinion, and his inflexible determination to render his office" (meaning the office of governor aforesaid) " an instrument for enriching his family.

" For voting to enact the bill to incorporate the *Merchants' Bank*, contrary to his former opinions and expressed declarations, and with full notice of the corruption which had been practised.

" For publishing doctrines unworthy of a chief magistrate, and subversive of the dearest interests of society.

" For declaring in such publications, " that the means employed to pass a bill may be infamous, and the motive of every member corrupt, and yet the law itself be salutary and constitutional;" thereby affording a pretext and apology for the most dishonourable practices; encouraging the approaches of bribery and corruption; perverting the morals of public representatives; destroying the purity of legislation; weakening the confidence of the people in the integrity of government, and over-

turning those sacred pillars of honour and honesty, by which republican institutions can only be supported.

" For personal and family ambition.

" For his" (meaning the said plaintiff's) " attempts to destroy the liberty of the press, by repeated and vexatious prosecutions, while papers under his own immediate influence, or the direction of his supporters, abound with infamous, licentious, and almost unparalleled scurrility.

" In prosecuting the chairman of a general meeting of citizens, for resolutions publicly passed, as the sense and opinion of that meeting, thereby exhibiting an instance of, and disposition towards, tyranny, novel and unprecedented, dangerous to civil liberty, repugnant to the spirit and genius of our free constitution, and utterly subversive of the principles of an elective government.

" In removing prominent republicans from office, for no other cause than their attachment to the constitutional liberties of their country, and with a view to provide for his own family and connections, and for such federalists as have united in their political league.

" In the appointment of strangers and non-residents to fill the principal offices in this city, to the exclusion of meritorious citizens better qualified ; and in violation of the spirit and express provisions of our charter.

" For secret but real hostility to the administration of Mr. *Jefferson.*

" For the conduct of his immediate partisans in the legislature, in refusing to afford a tribute of just approbation to the president of these *U. States,* at an important crisis of our national affairs, in order that he might gratify his own weakness and vanity, and obtain from the federal members of the house of assembly a vote of applause, with respect to his own unjust and impolitic administration.

" In calling out the militia of this state, in a manner and for purposes not contemplated or authorised by

law, thereby exercising his" (meaning the said plaintiff's) " powers as commander in chief, to the prejudice and inconvenience of our fellow-citizens, taking them from their respective habitations and occupations, and causing many of them to travel considerable distances, and to incur unnecessary expense, without any other real use than to afford himself" (meaning the said plaintiff) " an opportunity to exhibit his person, and perhaps to exercise political influence ;" (meaning thereby, and intending to cause it to be believed by the good people of the said state, that the said *Morgan Lewis*, while governor as aforesaid, had, in calling out the militia of the said state, acted wantonly and illegally, and had been, in so doing, actuated by motives of vanity and vainglory; and for corrupt purposes of exercising political influence and intrigue, and thereby intending to subject the said *Morgan Lewis* to the hatred, ridicule, contempt, and indignation of the good people of the said state.)

" For misrepresenting the sentiments of the republicans of the city of *New-York*, and endeavouring to subject them to the undeserved odium of their republican brethren of this state.

" For the conduct of himself" (meaning the said *Morgan Lewis*) " and his friends in the house of assembly, in withdrawing themselves from the major part of the republican representatives, and with the aid of the federalists in the house, selecting a council of appointment, in order that he" (meaning the said *Morgan Lewis*) " might possess an opportunity to gratify his" (meaning the said *Morgan Lewis's*) " revenge, to displace republicans, and appoint his own dependents to office, without any regard to the public service, but on the contrary that his" (meaning the said *Morgan Lewis's*) " official influence thus obtained might be rendered a means of promoting his" (meaning the said *Morgan Lewis's*) " own election.

" In these and other instances, he has justly forfeited public confidence, and rendered himself entirely unfit to be continued the chief magistrate of a virtuous, free, and independent people."

The second count stated that the defendant *wrote* and published, and procured to be *written* and published, the same libel as is set forth in the first count. The damages of the plaintiff were laid at 10,000 dollars. The defendant pleaded not guilty.

The cause was tried at the *New-York* sittings, on the 10th *December*, 1808, before Mr. Justice *Thompson*.

At the trial, to prove the publication of the libel, the plaintiff produced three affidavits made in this court, one by the defendant, one by *Pierre C. Van Wyck*, and the other by *James Townsend*, and which were taken on the 13th *May*, 1807, for the purpose of being used in this court, on showing cause why an attachment should not issue against the said persons for a contempt.* These affidavits were as follows :

* See 2 *Johns. Rep.* 290.

" City and county of *New-York*, ss. *William Few*, being duly sworn, saith that he presided as chairman at the public meetings of the second and eleventh days of *March* last; and that in the agency which the said deponent had either in adopting, or agreeing to the resolutions and address, which were passed and agreed to, at those meetings, this deponent had no intention of committing a contempt of this court, or of interfering in any manner with the administration of justice. That this deponent believes, that in passing the said resolutions, and in adopting the said address, the said meeting only intended to exercise their right to canvass and judge of the acts and qualifications of *Morgan Lewis*, as a candidate for the office of governor. That as to the other matters in relation to the said meetings, this deponent believes that they are truly stated in an affidavit of *Pierre C. Van Wyck*, and further saith not.

W. FEW."

" City and county of *New-York*, ss.  *Pierre C. Van Wyck*, being duly sworn, saith, that the writ in the suit of *Morgan Lewis*, against *Thomas Farmar*, was returnable in *February* term last; that the declaration was not served until the sixth day of *March*, and that issue was joined therein, on the twenty-sixth day of *March*; that the said *Morgan Lewis* had, previous to commencing the said suit, been nominated as a candidate for the office of governor of the state of *New-York*; that this deponent is an elector qualified to vote for the said office; that a public meeting of citizens in the city of *New-York*, called for the purpose of nominating a candidate for the said office, took place on the second day of *March*, at which meeting a number of resolutions were passed, expressing their opinions of the persons who had been proposed as candidates for the said office, and making a nomination of *Daniel Tompkins*, as candidate for the office of governor; that this deponent was present at the said meeting, and that as far as this deponent had any agency in the passing of the said resolutions, he had no intention of committing a contempt of this court, or in any way interfering with, or influencing the administration of justice.  This deponent further says, that the said resolutions were passed unanimously, and that he believes there were at least six or eight hundred persons at the said meeting; that he believes it was the intention of the meeting, that the said resolutions should have an effect upon the election, and that the annexed are a true copy of the same: but this deponent utterly denies all intention of interfering in any manner with the decision or progress of the said cause; that this deponent believes the said resolutions expressed the true opinion of the persons composing the said meeting, and was intended only to be a constitutional exercise of their right to canvass and judge of the acts and qualifications of the said *Morgan Lewis*, as a candidate for the office of governor.  This deponent further saith, that the public meeting at which the address to the electors of the

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

state was adopted, took place on or about the eleventh day of *March* last; that the same was unanimously agreed to, and ordered to be published by the said meeting; that this deponent was appointed secretary, by a vote of the said meeting; that in the agency which this deponent had, either in the adoption or publishing of the said address, this deponent had no intention, nor did he entertain any idea, that he was committing a contempt of this court, or in any way interfering with, or influencing the administration of justice. This deponent further saith, that in passing the said resolutions, and agreeing to, and in publishing the address, this deponent considered himself as exercising the right of an elector, to consider of and communicate information respecting the qualifications of a candidate for an elective office, and agreed to the said resolutions and address with that view, and not with a view to interfere with the administration of justice; that the said address was intended to have an effect upon the election, and that the annexed is, as he believes, a copy of the same; that in the annexed newspaper called the *Morning Chronicle*, is a publication purporting to be a letter from *Morgan Lewis*, and which this deponent believes the said *Morgan Lewis* wrote and procured to be published; and that the same was published in different papers in the city and state of *New-York*, and circulated in the said state; and that the publication of the said letter in the paper annexed, is accompanied with certain resolutions which this deponent believes to have been passed and published by certain of *Morgan Lewis's* confidential friends, after the commencement of the said suit; that in the annexed newspaper, called the *American Citizen*, is a publication purporting to be a letter from *William Slosson*, attorney for *Morgan Lewis*, and which this deponent believes is a true copy of a letter, written by the said *William Slosson*; and this deponent believes that the knowledge of the persons composing the meeting, at which the said resolutions were

passed respecting the said suit, was derived from the publication of the above-mentioned letters, and the resolutions which accompanied the said letter of *Morgan Lewis*, and further this deponent saith not.

"P. C. VAN WYCK."

"City and county of *New-York*, ss. *James Townsend*, being duly sworn, saith, that a public meeting of citizens in the city of *New-York*, called for the purpose of nominating a candidate for the office of governor of the state of *New-York*, took place on the second day of *March* last; at which meeting, a number of resolutions were passed, expressing their opinions of the persons who had been proposed as candidates for the said office, and making a nomination of *Daniel Tompkins*, as candidate for the office of governor; that this deponent acted as secretary, at said meeting; that as far as this deponent had any agency in passing the said resolutions, he had no intention or idea of committing a contempt of this court, or in any way interfering with, or influencing the administration of justice; that this deponent believes, that in passing the said resolutions, the said meeting only intended to exercise their right to canvass and judge of the acts and qualifications of *Morgan Lewis*, as a candidate for the office of governor; that as to other matters in relation to said meeting, this deponent believes that they are truly stated in an affidavit of *Pierre C. Van Wyck*, and further saith not.

"JAMES TOWNSEND."

It was admitted, that the above affidavit of *Van Wyck*, was the one referred to in the affidavit of the defendant. The paper containing the *address*, mentioned in the affidavit of *Van Wyck*, and as being annexed to it, was also read in evidence. It was entitled as follows : "At a very numerous and respectable meeting of the republicans of the city of *New-York*, held at *Martlings*, on the 11th *March*, 1807, in pursuance of public notice, Col. *Few*, chairman, *Pierre C. Van Wyck*, secretary, the

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

following address, reported by the general committee, was read and approved and ordered to be published."(*a*) It contained, among other things, the libellous matter set forth in the plaintiff's declaration, with the difference

(*a*) The address was as follows : " Address to the electors of the state of *New-York.* Friends and fellow-citizens ! It is at an interesting period of affairs, and respecting a subject of the greatest general importance, that we now address you ; upon the justice and wisdom of the decision we are soon to make, it intimately depends whether our public prosperity shall be promoted, the republican cause preserved and tranquillity again restored to the state.

" Attached to principles of civil liberty, to the equal rights of mankind, and to the republican constitution of our country, we sincerely wish, and shall always diligently endeavour to maintain these blessings and privileges which were procured by our revolution, and transmit them unimpaired to posterity.

" Distinguished from every other people, by the wisdom and the excellence of our public institutions, it remains for us to evince that we are entitled to that superiority, not only by our vigilance in protecting public liberty, but by our discernment in the judicious exercise of the elective franchise.

" We are soon to select a chief magistrate for our state ; in the choice we are to make, we are bound by the strictest and most sacred obligations to the community. The republican cause embraces and preserves the dearest and most inestimable interests of our country ; we should therefore endeavour to perform this most pre-eminent of our social duties, with penetration and impartiality ; we should carefully search for talents and virtue ; for a statesman whose capacity to govern our concerns, is united with patriotism, disinterestedness and fidelity. We have long regretted, and we still lament, that any divisions should exist among those who claim, in common, the republican name. Opposed to the re-election of *Morgan Lewis*, and yielding a decided preference to a different candidate, we owe to you and to ourselves, an undissembled explanation of the motives by which we are actuated ; of the principles by which we are governed.

[Here follows the words above stated as libellous.]

" And finally, we object to the re-election of *Morgan Lewis*, because a majority of the republican representatives, acting with pure intentions, and with fidelity to the general cause, have made a more respectable and worthy nomination ; and he the said *Morgan Lewis*, is not the rightful candidate of the republican party.

" Fellow-citizens, we have thus afforded a summary of our principal reasons for strenuously opposing the re-election of Mr. *Lewis.* We submit these reasons to you, with a full conviction of their justice, and with a perfect reliance that you will consider them with unprejudiced attention. Our cause is sacred ; our interests are the same ; we are bound by the same duties, and must share a common fate. A great majority of our republican representatives, assembled at *Albany,* have nominated unexceptionable candidates ; it

only of the words, " *United States*," instead of " *U. States;*" and it was subscribed by the defendant as chairman.

To this evidence, the counsel for the defendant de= murred, and the plaintiff joined in the demurrer.

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

becomes our duty as faithful and disinterested republicans, to afford such nomination our candid support.

" The wise and the worthy of every description, must view with equal disapprobation and alarm, the combination of a body of men, totally regard= less of the principles of our government, and engaging in political pursuits with no other view than to participate the offices of state.

" We have been injured and calumniated by Mr. *Lewis*, and his parti= sans. We appeal with confidence to the discernment, the rectitude, and the justice of our fellow-republicans; to them we state the undeserved wrongs we have suffered; we rely upon their friendship and their co-operation in support of our mutual rights; and while we have never arrogated to ourselves the least superiority, or attempted to assume any lead whatever in our gene= ral concerns, we shall always contribute to carry into effect, the ascertained will of a majority of our republican fellow-citizens; we, therefore, the repub= licans of the city and county of *New-York*, at a full and general meeting, do highly approve of the nomination made by a great majority of the republican representatives in senate and assembly, convened at *Albany*, of *Daniel Tomp= kins*, for the office of governor, and *John Broome*, for the office of lieute= nant-governor, and we earnestly recommend that the same may be vigorously supported. Judge *Tompkins*, has been a uniform republican; in private and in public stations he has ever been an advocate for the constitutional liber= ties of his country; he is the son of a worthy farmer of *Westchester*, unin= cumbered with proud family connections, and taken from the ranks of the people; he is a decided and steadfast republican; his talents are eminent; his manners plain, amiable and unassuming, and to us it appears, that he is in every respect, the character required by the present situation of affairs.

" Mr. *Broome*, at present fills the situation of lieutenant-governor; he is a man of the revolution, and his character highly respectable; you have here= tofore afforded him your support; he deserves to retain that confidence which he then inspired.

" We respectfully submit the present address to your attention; we have no other object in view, than the preservation of the republican cause; sacred to us, because it is consecrated to the dearest interests of our country. We have adopted a nomination, legitimate and regular. We unite with the re= publican representatives, in recommending men of talents, firmness and in= tegrity, and we ardently confide, that their election, with the blessings of divine providence, will preserve the peace, perpetuate the liberties, and re= store the tranquillity of the state.

" *William Few*, chairman.     *Pierre C. Van Wyck*, secretary.

" New-York, *March* 11th, 1807 "

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

The following points were made by the counsel for the defendant:

1. That the supposed libel produced in evidence, did not support the one set forth in the declaration, on which the issue was joined; the words *United States* being in the one, and the words *U. States* in the other.

2. The proof of the publication of the supposed libel was not sufficient.

3. There was no evidence of malice, express or implied.

4. The publication, if proved, was justified by the occasion.

5. The evidence does not support the averment in the second count, that the defendant *wrote* and published the libel, &c.

*Riker*, for the defendant, was about to argue in support of the demurrer to the evidence; when

*Slosson*, for the plaintiff, objected, that a bill of exceptions had been taken, which ought first to be argued,* or the defendant make his election, as to one, and waive the other.

*Laws N. Y. 32 sess. c. 186. s. 5.*

*Emmet*, for the defendant, said, that he now meant only to argue the demurrer to evidence.

KENT, Ch. J. We cannot compel the party to make an election, in this case. If it was a motion for a new trial, it might be otherwise. We must give our opinion on the demurrer to the evidence, if the defendant demands it, and chooses to bring on the argument.

*Riker.* 1. The libel produced in evidence varied from the one stated in the plaintiff's declaration. In an action for words spoken, it was formerly held, that

they must be proved precisely as they are laid in the declaration; but this rule has, in later times, been relaxed. Still it continues in regard to a libel or written slander, where the libel must be set forth *in hæc verba*, and proved.

You cannot declare according to the tenor and effect; but the precise words must be set forth.\* In *Boyce* v. *Whitaker*,† Lord *Mansfield* said, that if the defendant had set out the statute unnecessarily in his plea, 'that " he would hold him to half a letter."

In the case of *King* v. *Marsack*,‡ where in reciting a statute, *or* was put for *and*, the court held the variance fatal. The strict principle which prevails in regard to indictments, or declarations on statutes, is equally applicable to declarations for libels.

2. There was not sufficient proof of the publication. The affidavit of the defendant became necessary, in the course of judicial proceedings. It would be unreasonable and oppressive, that an affidavit, so taken, should be used to prove the publication of a libel. The affidavit was made to defend the party against an attachment for a contempt, and as a justification of his conduct. " What," says Lord *Mansfield*,§ " when taken abstractedly, would be a publication, may, from the occasion, prove to be none, as if it was read in a judicial proceeding."

[KENT, Ch. J. Must not a witness answer to a question, though his answer may subject him to a *civil* suit?]

But here the party is not only subjected to a civil suit, but he may also be indicted for the libel.

3. There was no evidence of malice in the defendant, express or implied. Where words are spoken, or a letter written, *bona fide*, by a master, concerning the character of a servant, though the specific acts or crimes

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

\* 2 *Salk.* 417.
3 *Salk.* 226. 6
*Term Rep.* 162.
*Holt's Rep.* 425.
Ld. *Raym.* 414.
*Cowp.* 229. 8
*Wentw. Plead.*
322.
† *Doug.* 94. 97.

‡ 6 *Term Rep.*
77 s.

§ 1 *Term Rep.*
111. 5 *Co.* 125. b
9 *Co.* 59. b.

* 1 *Term Rep.*
110.

† 2 *Ld. Raym.*
1493. *Gilb. Rep.*
193. 1 *Wils.* 132.
*Bull. N. P.* 14.
1 *Term Rep.*
520.

:: *Cro. Jac.* 90,
91. *Hob.* 328.
4 *Co.* 14.
*Styles,* 462.

§ 1 *Bl. Rep.* 386.
3 *Johns. Rep.*
130. 3 *Esp.*
*Cases,* 32. 5
*Esp. Cases,* 109.
*Esp. Dig.* 506.
1 *Saund.* 132.
2 *Inst.* 228.
*Dyer,* 285.
1 *Roll. Abr.* 87.
(M.)

are charged, and which turn out to be false, yet no action lies. The words must be proved to be malicious, as well as false.* The present case may be considered as analogous. The people must be regarded as the sovereign or master, and the persons elected as their agents or servants. It is essential, in an elective government, that the people should be at liberty, *bona fide,* to express their opinions of any public officer, or candidate for office. And the question of *bona fides,* or *malice,* should be decided by the court; for it would not be safe, in cases of this kind, to leave it to a jury, to infer malice.† The court always decide on the construction of writings; and in the case of a libel, or written slander, the court ought to decide whether it be malicious. Such a rule would guard against prejudice and abuse, and not be liable to the fluctuating opinions of different juries.

4. The publication was justified by the occasion, and therefore not a libel. Courts have been liberal in allowing a freedom of speech, for the furtherance of justice. For words spoken by an advocate, in defence of his client, which would be actionable, if spoken on any other occasion, no action lies.‡ No action lies for words spoken or published in a court of justice; nor where the words are spoken in a course of religious discipline, nor where they relate to grievances, and are addressed to those who have the power to redress them.§ In the present case, the publication was addressed to the people, who alone have the power to remove a bad magistrate, and thereby redress a public grievance. There is no mode of addressing the people, but through the press. The exposure of the grievance, therefore, necessarily, becomes general.

5. There is no evidence whatever, that the defendant wrote, or caused to be written, the libel in question.

The demurrer to evidence cannot vary the case. It has been supposed, that a demurrer to evidence admits

every fact which the jury might possibly have inferred. This rule was correctly laid down, in the case of *Stephens* v. *White*, by the court of appeals of *Virginia :** That on a demurrer to evidence, " the conclusion of fact must be such as the jury might, *from a just and reasonable construction*, have made, and not arbitrary inferences, or such as might be drawn from a part only of the whole evidence." The inference must necessarily arise from the fact; not such as a jury might, in their caprice, infer. The court are, then, to decide, whether malice is a necessary and fair inference from the facts in this case ; and whether the jury would have been justified in making such an inference.

*Slosson* and *Griffin, contra.* On a demurrer to evidence, the only question is, whether the point in issue between the parties has been proved. No objections can be made to the pleadings.† If a party will, by a demurrer to evidence, take the cause from the decision of the jury, the proper tribunal to ascertain facts, every inference which the jury could have drawn, may be drawn by the court.‡ Again, on a demurrer to evidence, the court will not decide on the admissibility of the evidence. Where improper evidence is admitted, the objection must be made at the trial, and a bill of exceptions tendered. Having stated the principles as to a demurrer to evidence, we shall proceed to discuss the points in the cause.

1. The defendant, in his affidavit, admits, that he was chairman of the meeting; and *Van Wyck*, in his affidavit, the truth of which is admitted by the defendant, states that the address was passed unanimously. A jury might, then, fairly infer a publication by the defendant. The evidence is, that a publication had been made, and a copy was produced. The affidavits were not offered as evidence of a publication, *per se*, but of a previous

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

* 2 *Wash. Rep.*
203. 210.

† *Tidd's Prac.*
732 *Doug.* 21 S.

‡ *Doug.* 119.
2 *H. Bl.* 189.
2 *Caines,* 134.
1 *Johns. Rep.*
245.

publication admitted by the defendant. The address was unanimously ordered to be published, and the defendant subscribed his name to it, and sent it forth to the world. By subscribing his name, as chairman, the defendant deliberately sanctioned and approved of the publication. If the resolutions had been contrary to his opinion, would he not have expressed his dissent?

It has been said, that the libel produced varied from the one stated in the declaration. On a demurrer to the evidence, no advantage can be taken of defects in the declaration. But in truth, the variance is wholly immaterial. The declaration does not set forth the libel according to the tenor, or words, but according to the substance and sense. In the case of *The Queen* v. *Drake,*[*] Lord *Holt* says, there are two ways of describing a libel in pleading; one by the words, the other by the sense. If you declare according to the tenor, or words, the least variance is fatal. If by the sense, the exactness of the words is not material. In the case of *Rex* v. *Beach,*[†] Lord *Mansfield* adverts to this distinction taken by Lord *Holt*, as the true one; and he observes, that the jury had a right to read the word *undertood* as *understood;* and that where the omission or addition of a letter did not make another word, it was not material. So, in the present case, the jury might have read *U. States* as if it were *United States.* In the case of *The King* v. *May,*[‡] the same distinction was recognised. It was an indictment for perjury, and in describing the original indictment the word " *despaired*" was omitted, yet the variance was not held fatal. So, in *King* v. *Pippet,*[§] the word *if*, in setting forth a precept, was omitted, but it was held not to be a fatal variance.

All writing consists of certain characters, which have certain powers; and many contractions, by common consent, have the same force and meaning as the words contracted. Abbreviations are not held to be variances;

* 2 *Salk.* 660.

† *Cowp.* 229.

‡ *Doug.* 193.

§ 1 *Term Rep.* 235.

as, *reicevd*, in an indictment, was held by the twelve judges in *England*, an abbreviation, and that the jury might read it *received.*\* The jury might consider *U. States* as an abbreviation of *United States*, especially if there was usage to warrant it. In a late proclamation of the President of the *United States*, and in various public documents, we find the words *U. States* used for *United States*.

NEW-YORK, Nov. 1809.

LEWIS
v.
FEW.

\* *King* v. *Hart*, 1 *Leach*, 172.

2. Then is this action sustainable, or was the defendant justified in the publication? Precedents of declarations for similar libels may be found in *Modern Entries.*† To support an action for a libel, there must be malice, express or implied. In most cases, the malice must be implied. Malice is a settled and deliberate design to injure another. What excuse or justification does the defendant offer to repel the presumption of malice? That the writing was published by him, as a chairman of a public meeting of electors, convened for the purpose of deciding on a proper candidate for the office of governor. Where a party means to rely on his character or situation, as an excuse or justification, he ought to plead it.‡ So, where the defendant relies on the publication having been made in the course of judicial proceedings, he must plead the matter specially.§ If no such excuse or justification exists, there can be no doubt that the action is maintainable. If the defendant relies on matter extrinsic, he ought to plead it.¶

† *Mod. Ent.* 203. 208.

‡ *Saund.* 131. 1 *Roll. Abr.* 87. (M.)

§ 2 *Burr.* 807.

¶ 2 *Str.* 1200. 1 *Johns. Rep.* 46.

But has the defendant, in fact, given in evidence sufficient matter of excuse or justification? He has offered no evidence of the truth of the charges against the plaintiff. He does not even pretend that he was misinformed, or that he believed them to be true. The address is not entirely of a political nature, nor does it express mere opinion. It contains distinct and positive charges of a criminal nature. The falsehood of these accusations must be presumed, until the truth of them is proved.

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

But the falsehood of the charge is admitted by the pleadings; and it stands on the record, that the defendant has published false and injurious charges against the plaintiff. How then is he justified by the *occasion?*

Let us examine the cases in which it has been held, that the *occasion* may justify words, for which an action could otherwise be maintained. Where words are spoken from pity and concern for the object of them, no action lies, because there is no malice.* Another class of cases is, where words are spoken by way of advice, or in answer to an inquiry as to the character of a servant.† In those cases, the words were not published to the world at large, but spoken only to the person making the inquiry.

There are other cases relating to words spoken, or writings, in the course of judicial proceedings, in courts, or before persons acting *quasi* courts. There the defendant is justified from the necessity of the case. As if words be spoken by an advocate, in the legal and necessary exercise of his profession, no action lies; but if counsel will unnecessarily and wantonly go out of the path of their professional duty, to asperse the character of another, an action lies.‡ The ground on which courts in similar cases have proceeded is, that the words were spoken before a tribunal competent to correct the matter of complaint, or to redress the grievance. But the address in the present case was to the world, not to the court for the trial of impeachments.

The proposition attempted to be maintained by the other side, is, that electors may meet together for the purpose of canvassing the qualifications of candidates for public offices, and publish to the world what they think of them, provided there is no *express* malice. There is no evidence that the defendant, or any other person present at the meeting, except *Van Wyck,* was an

* 1 *Lev.* 82.

† 1 *Term Rep.* 110.

‡ *Cro. Jac.* 90.

elector.   But admitting that all the persons present at
the meeting were electors, does it follow that a man who
offers himself, or is held up by his friends, as a candi-
date for a public office, is to lose that protection which
the law affords to the meanest citizen? that he is to be
considered as an outlaw? as a mark to be shot at, or to be
held up to public scorn and derision?

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

On this point, the court must decide according to the
common law.   If we look into the cases decided by the
*English* courts, no authority is to be found to support
the proposition contended for by the other side.   In
*How* v. *Prinn*,* the words were spoken of a plaintiff
who intended to stand candidate as a knight of the
shire to serve in parliament, yet that was not suggested
as a matter of excuse, and the action was held maintain-
able.   The case of *Clayes* v. *Rowe*,† was also that of a
candidate for member of parliament; yet that circum-
stance was not mentioned by way of justification, but
seemed to be considered rather as an aggravation.   In
the case of *Onslow* v. *Horne*,‡ the slanderous words
were spoken by the defendant at a meeting of the elect-
ors of the county, qualified to vote for the election of
members of parliament, for the purpose of instructing
the plaintiff and another, who were representatives of
the county in parliament.   The defendant was a man
of talents, possessed of great political information, a
conspicuous and zealous advocate for liberty, and well
instructed in all the rights and privileges of *British* free-
dom; yet we do not find a hint of any such *privilege* of
an elector, as that now claimed by the present defend-
ant.   It is well known that the members of the *British*
parliament are elected by the people.   If, then, these ac-
tions for slander have been brought there for a long series
of years, in regard to members of the house of commons,
and no such excuse has been set up, the court may well

* 2 *Salk.* 694.

† 3 *Lev.* 30.

‡ 3 *Wils.* 177.
2 *W. Bl.* 750.
S. C.

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

* 4 Bos. & Pull.
47. or 1 N. S.

conclude, that the common law knows of no such justifi-
cation.

But in a recent and analogous case, that of *Harwood*
v. Sir *Jacob Astley*,* in the court of C. B. in *England*,
we find the counsel for the defendant taking almost the
same ground of defence, as that assumed by the defend-
ant's counsel in the case now before the court. But Sir
*James Mansfield*, without hearing the plaintiff's counsel,
decided, that " if the words be actionable in themselves,
it is quite immaterial whether they were spoken of the
plaintiff, as a candidate or not." " It seems," he ob-
serves, " to be supposed, that the situation of a candi-
date for parliament is such as to make it lawful for any
man to say any thing of him. To that proposition I
cannot assent; nor is it to be collected from any of the
cases which have been cited. It would be a strange doc-
trine indeed, that when a man stands for the most ho-
nourable situation in the country, any person may ac-
cuse him of any imaginable crime, with impunity." This
unanimous opinion of the court of C. B. was afterwards
affirmed in the house of lords.

In the case of *The People* v. *Croswell*, argued in this
court, in *February* term, 1804, by very learned and able
counsel, the defence now set up was never thought of.
*Croswell* was an elector, and made his publication, no
doubt, with the patriotic intention of enlightening the
body of electors, as to the character of the President of
the *United States*. It seems to have been reserved for
the ingenuity of the counsel of *Harwood*, in *England*,
and the defendant's counsel here, to suggest this new
doctrine for the first time.

It is the undoubted right of the people to assemble
together to discuss public measures, and the qualifica-
tions of candidates for public office. They may freely
speak, and publish the truth, and the whole truth : but
this cannot authorize them to publish *falsehoods*, and

atrocious libels, concerning public candidates. Political

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

meetings are not to be sanctuaries for libellers and slan-
derers, from whence they may issue their calumnies
with impunity. The counsel for the defendant, aware of
the odious nature of their proposition, qualify it by say-
ing, that the publishers are liable to an action, in case
of *express* malice. But what stronger evidence of ma-
lice can there be than the deliberate publication of a
falsehood? a settled design to injure and destroy the
character of another? It is admitted in one of the affi-
davits read in evidence, that the object of the publica-
tion was to influence the election; and how was the
election to be influenced, but by depreciating or destroy-
ing the character of the opposing candidate? The consti-
tution, which secures the freedom of elections, does not
warrant the publication of falsehoods. Information to
the electors, implies truth and certainty; honest and cor-
rect information. Malice, in all cases, like the present,
must necessarily be proved by *overt* acts. No man will
have the frontless assurance to avow his malicious in-
tent. Patriotic pretences will never be wanting, at all
political meetings, to disguise the design to destroy such
public men as are obnoxious to them. The history of
republics, ancient and modern, affords us dreadful exam-
ples and most instructive lessons on this subject.

The legislature, in the act for regulating *elections*,* * 24 Sess. c. 62
evince a disposition to guard them from undue influ- s. 17.
ence, by prohibiting bribery, menace, or any other cor-
rupt means or device, directly or indirectly, to influence
an elector. They intended that the suffrages of the peo-
ple should be, as far as possible, free and unbiassed.

Again; the meeting at *Martling's* was not a *constitu-
tional* meeting of the people. Our political constitution
acknowledges no political meetings of the people, except
at the polls, where the electors meet for the purpose of
giving their votes.

* 1 *Term Rep.*
110.

It is said, that the people are the masters, and the governors, or representatives, are their servants ; and the case of *Weatherston* v. *Hawkins*,* has been cited on the ground of a supposed analogy. The people, it is true, in their political capacity, constitute the supreme and sovereign power of the state ; and may, in that view, be justly considered as the sovereign or master. But when do the *people* appear and act in this sovereign capacity ? only when they meet to elect their representatives. Who are the people ? The great body of electors. But any assemblage of citizens, whether electors or not, for the purpose of promoting the election of a particular candidate, and of influencing the electors to vote for their favourite, is not *the people*, or sovereign in this constitutional sense. It would be a most dangerous doctrine, and productive of the greatest licentiousness, if such meetings were to be considered as *the people*, and possessing the attributes and immunities of sovereignty. The defendant and his friends are respectable men ; and all those who assembled at *Martling's* may have been respectable men ; but other men, less respectable, may assemble, (for bad men throng to such meetings,) and call themselves the people. But the situation of public magistrates, and public candidates, would be deplorable, indeed, if the law afforded them no protection against the slanders uttered by such meetings. Individuals may be restrained by shame, fear, or personal considerations ; but an assembly will not be influenced by such motives. A multitude never blush. While, therefore, the right of the people to assemble and discuss public measures, and the merits of candidates for public offices, is held sacred, the law should be careful to guard against the abuse of this privilege.

*T. A. Emmet*, in reply. 1. I admit, that on a demurrer to evidence, no objection can be made to the

pleadings. But a libel must always be set forth according to the tenor, and not according to the purport or sense ; and the declaration in the present case is according to the tenor.

NEW-YORK, Nov. 1809.

LEWIS v. FEW.

In the case of the *King* v. *Powel,** it was held that the words, " as follows, to wit," was an averment of the tenor. Now, tenor imports the same words, or an exact transcript of the libel.† Identity of sense is not sufficient ; there must be an identity of words. As the libel or subject matter of the suit, is to be construed by the court, it is essential that it should be set forth *verbatim*.

The case of *The King* v. *Drake,‡* is a mere *obiter dictum* of Lord *Holt ;* and it was a criminal case. I have searched all the *Latin* entries for precedents, and I find only two, in *Robinson's* entries. *Wentworth,§* in his collection of pleadings, directs that the libel, should be set out *verbatim*, as the smallest variance would be fatal. In *Zenobio* v. *Axtell,¶* which was an action for a libel in the *French* language, it was held that a translation was not sufficient, but 'the original words must be set forth. In the case of *The King* v. *Wilkes,*** on the application of the attorney-general, Lord *Mansfield* ordered the record to be amended by striking out the word " purport" and inserting the word *tenor*. The libel, in this case, having been set forth according to the tenor, the paper produced must be according to the tenor. Any *verbal* mistake or variance is fatal. The mistake of a letter will not be fatal, unless it makes another word. Abbreviations are allowed, where the word intended cannot be mistaken.†† The case of *Rex* v. *Beach* was an indictment for perjury, in which it was not necessary to set out the matter according to tenor. In that case Lord *Mansfield* said, that the jury might read under*t*ood as understood ; but with submission to his lordship, I cannot conceive how the jury

* 2 *W. Black*-787.

† 3 *Salk.* 227.

‡ 11 *Mod.* 69. S. C. 2 *Salk.* 660.

§ Vol. 8. 302.

¶ 6 *Term Rep.* 162.

** 4 *Burr.* 2527. 2 *Leach,* 753.

†† 2 *Leach,* 933. *Dougherty's Crown Circ. Comp.* 565. 572. notes.

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

were to read the record at all, or what they had to do with it. *Sed nonunquam bonus dormitat Homerus,* The case of the *King* v. *Hart,* was that of an indictment, and the paper was set forth according to its tenor; the abbreviation could not well be mistaken. But the letter *U.* may stand for many other words, besides *United,* as, for example, unhinged, unfortunate or unhappy.

2. There is no evidence of a publication by the defendant. It is said, that the court, on a demurrer to evidence, are to infer every thing which the jury might possibly have inferred. This is an extravagant extension of what I conceive to be the true rule; which is, that every inference which the jury could *reasonably* have drawn from the evidence, may be deduced by the court. If the court will set aside a verdict as against evidence, because the jury have made an inference not warranted by the evidence, why will they not exercise the same power as to inference, on a demurrer to evidence?

Again; the evidence does not support the second count in the declaration. The allegation that the defendant *wrote* the libel, is a material averment, and ought to have been proved. The defendant's affidavit admits nothing, except his being a chairman of the meeting. He does not state that he assented to the resolutions. His situation precluded him from expressing any opinion or voting on the question; he was silent and passive. A libel, as Lord *Coke* observes, is published *traditione, cantilenis aut verbis.** Suppose the address had been read, and had then been negatived by the meeting, would this have been a publication of the libel? Suppose the defendant had laughed at it and approved it, but the meeting had rejected it, would the defendant have been liable for publishing the libel? But there is no evidence that he either read or assented to it. He had no control over the meeting; and he ought not be made liable for the acts of others. The defendant, by his reference to the

* 5 Co. 125.

affidavit of Mr. *Van Wyck*, adopts it only in regard to what passed at the meeting. There is nothing in that affidavit which brings the fact of publication home to the defendant. There is no evidence of any act done after the meeting. It is said merely, that the address was ordered to be published; not that it was in fact published; and for aught that appears on the record, that order may have been revoked. The doctrine contended for by the counsel for the plaintiff, is new and dangerous; its tendency is to prevent all public meetings; for no man will dare to be a chairman, or preside at such meetings, if he is to be answerable, civilly, for all their acts. There is no proof of any publication by the defendant, at the meeting, nor of any act done by him after the meeting; and his affidavit being in the course of judicial proceeding, is admitted not to amount to a publication.

3. There can be no inference of malice in this case; for the jury had no right to make the inference. In an action for a libel, if the plaintiff proves the publication only, he must have a verdict; because the law infers malice. In the case of *The King* v. *Oneby*,[*] in the court of *King's Bench*, all the judges agreed to the proposition, that the court are judges of the malice, not the jury. *Malice* and *maliciously* are terms of law; and in the legal sense, always exclude a just cause.[†]

To make out malice in the defendant, the court must decide that the meeting and the publication were, in the language of Chief Justice *Parker*, *without just cause.*

But it is said, that *falsehood* evinces malice. I deny that the falsehood of the charges is admitted on the record. It is not a demurrer to the declaration, but merely to the evidence. The falsehood was at issue between the parties. The demurrer to the evidence neither admits, nor denies the falsehood. *Falsehood* or not, is a question of *fact*; and the court cannot infer false-

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

[*] 2 Ld. Raym. 1485. S. C. Stra 766. 9 St. Tr. 14 See also Ld. Raym. 1584.

[†] Gilb. Cas. 185. Jones v. Given.

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

\* *Selwyn's N. P.* 929. note 4. 4 *Bac. Abr.* 456. *Libel,* (A. 4.)
† 7 *Term Rep.* 4.

‡ 1 *Saund.* 131.

hood.  In *England,* it does not seem to be clearly settled, whether, in an action for a libel, the defendant can give in evidence, the truth of the defamatory paper, in justification.\*  But the better opinion seems to be, that the truth may be pleaded in justification.  If the word *falsely* be left out of a declaration for a libel, it will be good.†  Then the falsehood could not be a matter in issue.  It cannot be said, therefore, that a demurrer to evidence admits the falsehood.  But it is contended that the circumstances on which the defendant relies for justification ought to have been specially pleaded; and the case of *Lake* v. *King,*‡ has been cited in support of that position.  But the *note of Serjeant Williams,* is expressly the contrary.  He says, " when the defendant admits the publishing or speaking of the libel or words as stated, but justifies so doing, because they are true, he must plead this matter specially."  " But where the defence is, that the libel or words, were published or spoken, not in the malicious sense imputed by the declaration, but in an innocent sense, or upon an occasion which warranted the publication, this matter may be given in evidence under the general issue."  Where there is no evidence of express malice, nor of any circumstances from which malice can be inferred, the mode and manner of publication or speaking cannot afford the legal inference of malice.

Every case in *England,* in which this question has been raised, has been either on a motion in *arrest* of judgment, or in error.  On a motion in arrest of judgment, there is a verdict of the jury ; and I do not deny, that if express malice is proved, this action is maintained ; and after a verdict, the court will be bound to infer proof of express malice.

If the doctrine for which I contend is pregnant with all the mischiefs which have been described, it is remarkable that the judges in *England* should have avoided de-

ciding so important and interesting a question, when presented to their consideration. In the case of *Onslow* v. *Horne*, as reported by Sir *William Blackstone*, the *third* proposition laid down by the defendant's counsel, was, that "if the words were actionable in themselves, the *occasion* of speaking them, would excuse them, being at a public county-meeting, where freedom of debate was necessary." And Chief Justice *De Grey*, on delivering the opinion of the court, says, " we shall give no opinion, how far such an occasion, as the meeting stated in the declaration, would or would not, justify speaking such words, as would be otherwise clearly actionable." The case of *Harwood* v. *Astley* came up on a writ of error, from a judgment of the king's bench, to the *exchequer chamber ;* and it is to be inferred, that the malice was proved. The accusation was of a most atrocious crime. The case of *Blanchard* v. *Thorne*, decided at the last session of the court of errors, came up on a bill of exceptions, and the opinion of the court was, that it was incumbent on the plaintiff to prove express malice, to demonstrate that an evil intention existed, to show that the writing complained of, was entirely false, and malicious ; though no positive opinion was given, whether malice was a question of law for the decision of the court only, or a question of fact to be determined by the jury.

I contend, then, that the circumstances in the present case do not afford any legal inference of malice. The meeting was *lawful.* At an *unlawful* assembly, every person is answerable for what is done ; but at a lawful meeting each person present, is answerable only for his own acts. To make out malice, the court must decide that the meeting was, in itself, unlawful. But is it illegal for a person, at such a meeting, to express his opinion ? It is said, that public assemblies may speak the truth ; and so may the meanest man in the street. The concession grants nothing. May not citizens, assembled

NEW-YORK,
Nov. 1809.

LEWIS
v.
FEW.

for the purpose of discussing the merits of public candidates for office, speak their opinion of the acts of a particular candidate, alleged to have been done at a distance, but under the responsibility of proving the truth of the facts in a court of justice ? It is admitted, that where a person speaks without cause, he must be responsible for the truth. But truth or falsehood, is not the distinction as to what may be said at a public meeting. It is the malice, or evil intention, which can alone render a person liable to an action for what is said on such occasions. There being a just cause or necessity for speaking, the falsehood of what is said, lays no foundation for an action, unless malice also be shown : And this malice must be brought home to the defendant. If one man should maliciously say or propose any thing at a public meeting, another who may be present, with very innocent intentions, ought not to be answerable for the malice of his neighbour.

THOMPSON, J. delivered the opinion of the court. This case comes before the court, on a demurrer to the evidence. The first question raised, relates to a variance between the libel set out in the declaration, and the one given in evidence upon the trial. In the former, the letter *U.* connected with *States,* is used ; and in the latter, it is *United States.* It is to be observed, in the first place, that upon a demurrer to evidence, no question can arise as to the admissibility of the evidence. That objection must come up, either upon a bill of exceptions, or on a motion for a new trial. The evidence having been admitted, and as we are now to presume, without objection, the question how far it conduced to the proof of the charge contained in the declaration, belonged properly to the jury. But the defendant having chosen, by demurring to the evidence, to substitute the court in the place of the jury, every thing which the jury

might reasonably infer from the evidence demurred to, is to be considered as admitted. The language of adjudged cases on this subject, both in our own and the *English* courts, is very strong, to show the court will be extremely liberal in their inferences, where the party, by demurring, will take the cause from the jury. (2 *Caines*, 134. 1 *Johns. Rep.* 243. *Doug.* 119. 2 *H. Bl.* 208.) Would the jury then have been warranted in reading *U. States*, *United States*, by considering *U.* as an abbreviation of United, or might not the U. be rejected, as surplusage, and the sense and meaning of the sentence remain the same ? That part of the libel in which these words occur reads thus : " In refusing to afford a tribute of just approbation to the President of these *United States*, at an important crisis of our national affairs."

Was this question to be determined by the rules of plain common sense, abstracted from any technical nicety, a doubt would not be entertained on the subject. I am far, however, from wishing to overleap the boundaries prescribed by adjudged cases, or relaxing what may once have been considered as the rule on this subject, any farther than is consistent with perfect safety, and a due regard to the advancement of justice. Nor do I apprehend that it is requisite to go farther than has already been done in *England*, in order to overrule this objection. A recurrence to the cases in the books becomes necessary for the purpose of seeing the progress of the rule now under consideration. And I think I am warranted in this preliminary remark, that courts have lately been less strict and scrupulous on this subject than formerly. In *Parker's* case, (*Hutton*, 56.) the word *indicari* was written for *indictari*, and held fatal. In *Turvill* v. *Aynsworth*, (2 Lord *Raym.* 1515. *Stra.* 787.) the word *Austrialia* was written instead of *Australia*, in the description of a corporation, and it was held a fatal variance ; and the court said it would not an-

swer to reject the word as surplusage, as it would make a different corporation. In the case of *The Queen* v. *Drake*, (2 *Salk.* 660.) in reciting the libel, the word *nor* was written for *not ;* and this was deemed bad on a special verdict ; because *nor* was different from *not*, both in grammar and sense. And *Powys*, J. said, literal omissions would be fatal, where a letter omitted or changed, made another word ; otherwise, where the word remained the same. The case of *The King* v. *Beach*, (*Cowp.* 229.) was a motion in arrest of judgment, in a case of perjury, for a variance between the indictment and affidavit ; the word *understood* being written *undertood ;* and Lord *Mansfield*, in giving the judgment of the court, said, " we have looked into all the cases upon the subject, some of which go to a *great degree of nicety indeed;* particularly in the case in *Hutton*, where *indicari* was written for *indictari ;* but that case, he observes, is shaken by the doctrine laid down in *Hawkins ;* the true distinction was that taken in the case of *The Queen* v. *Drake*, that where the omission or addition of a letter does not change the word, so as to make it another word, the variance is not material." He adds, that " a greater strictness is required in criminal prosecutions than in civil cases ; but this is a case where the matter has been fairly tried ; and the jury were right in reading the word *understood*." Upon what principle could the court or jury read the word *undertood* for *understood.* Upon no other, certainly, than because by looking at the context, the obvious sense and meaning of the sentence required it. Supposing this combination of letters, *undertood,* (making no word known in the *English* language,) should be presented to a person, and he asked what the writer must have meant by it ; would it be obvious that the letter *s* was omitted, and that *understood* was the word intended ; or would it not be rather more reasonable to suppose that the final *d* had been substituted for *k*, and that the word intended was *undertook.*

This case, (*The King* v. *Beach*,) then, must be considered as overruling the cases of *Parker*, and of *Turvill* v. *Aynsworth*, before referred to ; and as adopting these positions, that the variance is a proper subject for the jury to determine ; and that the sense and meaning of the *term* used, is to be ascertained by a reference to the context. The case of *The King* v. *Hart*, (1 *Leach*, 172.) was for forging an order ; and in setting it out in the indictment, the word received was written at full length, *received ;* in the order produced in evidence, it appeared to be *reicev'd*, both abbreviated, and the letters transposed. It was left to the jury to consider, whether they thought the two words imported one and the same thing. The prisoner was convicted ; but judgment respited for the opinion of all the judges, who determined it to be a proper question for the jury ; and that considering it an abbreviation, if it meant only the same word as that used in the indictment, it would not vitiate, for it could then only mean the same thing. This case authorises the conclusion, that where the variance consists in an abbreviation, and the jury consider it as meaning the same thing as the word in the indictment, it is immaterial. The case of *The King* v. *May*, (1 *Leach*, 227.) was an indictment for perjury, which in reciting that part of an indictment for an assault and battery, where it is alleged, that his life was greatly despaired of, the word *despaired* was entirely omitted ; and *Buller*, J. overruled the objection of a variance. A rule was obtained in the court of king's bench, to show cause why the verdict should not be set aside, and a judgment of acquittal entered ; but, it was afterwards abandoned without experiment. *The King* v. *Lookup*, (cited 1 *Term Rep.* 240.) was an indictment for perjury. The objection was, that the indictment stated the bill in chancery to be directed " to *Robert* Lord *Henley*," &c. whereas it was directed to " Sir *Robert Henley*, knight," &c. and the objection was over-

ruled.   The inference that I have drawn from the case,
of *The King* v. *Beach*, that you may look at the context,
in order to judge of the materiality of the variance, is
warranted by a variety of other cases to be found in
the books.   (*Doug.* 194. *note.* 2 *Hawk. P. C.* 340.
616. *notes.* 2 *M'Nally's Ev.* 519. and cases there cited.)

I have thus briefly referred to some of the leading ca-
ses on this subject, which show, as I conceive, a pro-
gressive relaxation of what Lord *Mansfield* called the
great degree of nicety to which this rule was once
carried.   If the principles contained in the more
modern decisions, are applied to the case before us, I
think they are amply sufficient to warrant us in saying,
that the variance is immaterial ; and that the letter *U.*
when taken with the context, means precisely the same
thing as the word *United.*   It is a common and well un-
derstood abbreviation.   Whether an abbreviation con-
sists of one letter or of several, cannot, in principle,
make any difference ; the true question is, whether the
abbreviation in the declaration, means the same word as
that used in the libel ; if so, it falls within the rule
adopted in the case of *The King* v. *Hart.*   If the letter
*U.* standing as it does, is senseless, without some other
letter added, whether one or more letters be added,
cannot be material, if they are such as the sense and
context necessarily imply ; and then it falls within the
case of *The King* v. *Beach.*   If the letter *U.* should be
considered as altogether rejected, it would not be taking
greater liberty, to supply, by intendment, the word *Uni-
ted*, than was done in the case of *The King* v. *May,*
where the word *despaired* was supplied by intendment.
The *U.* may be rejected altogether, and the sense and
meaning of the libel remain the same.   *The President of
these States*, when read with the context means precisely
the same thing as *the President of these United States.*
(1 *Term Rep.* 235. and cases there cited.)   Suppose the

variance was in using the word *and*, instead of the charac-　ter (*&*) frequently used for it, can it be pretended that　this would be fatal? I presume not. And why? Because　it is a representation of the same thing. The objection　therefore, in my opinion, ought not to prevail.

NEW-YORK,<br>Nov. 1809.<br>LEWIS<br>v.<br>FEW.

2. It is objected, in the second place, that there is not sufficient evidence of a publication. This appears to me also untenable. The reading of the libel in court, on the occasion referred to in the affidavits set forth, is not the publication complained of. These affidavits, and the copy of the address annexed, were only introduced to show that the defendant admitted a previous publica-tion; and if they do not afford evidence of that fact, no publication was shown. The defendant, in his affidavit, admits he was chairman of the meeting where the ad-dress was adopted; and, after detailing some facts, he says, that as to the other matters in relation to the said meeting, he believes they are truly stated, in the affi-davit of *Van Wyck*. The defendant thereby adopts *Van Wyck's* affidavit as his own; and we are to judge of the evidence therein contained, precisely as if the defendant had sworn to it. This affidavit admits, that the address was *unanimously* agreed to, and *ordered* to be *published*. The defendant being chairman, was of course one of the meeting: he therefore ordered it to be published. The address produced in court was a *copy*; there must, of necessity, have been at least one other in existence. It appears, upon the face of the address, to have been *printed* by *James Cheetham*, and to be an address to the republican citizens, throughout the state of *New-York*; and that it was unanimously agreed to, and ordered to be published, and the defendant's name, as chairman, was annexed. It is admitted, the address was in-tended to have an influence on the election, which ob-ject could not be answered, unless it was published.

CASES IN THE SUPREME COURT

The defendant declares, that in agreeing to and in *pub-lishing* the address, (not the copy produced in court,) he considered himself as exercising the right of an elector, to consider of and *communicate* information respecting the qualifications of a candidate for an elect-ive office, and not with a view to interfere with the ad-ministration of justice. Here appears to me to be an unqualified admission of the publication. He speaks of its having been already done, and assigns his reasons for so doing. It is nothing more nor less than a con-fession of, and an attempt to justify the publication. Can it be doubted, that these facts and circumstances tended to show an admission of a publication?

If the defendant had expressly acknowledged, that he had published a libel, of the tenor of the one set forth in the declaration, it would unquestionably have been suffi-cient; and if the evidence offered would have warranted the jury in drawing the inference of such an acknowledg-ment, the same conclusion must follow; and whatever the jury might infer, the court are bound to infer. The communication of a libel to any one person is a publica-tion, in the eye of the law. Thus we find it laid down in *Lamb's* case, (9 *Co.* 59.) and repeatedly recognised, in subsequent cases, that if he who hath either read a libel himself, or heard it read by another, do afterwards mali-ciously read or repeat any part of it in the presence of others, or lend or show it to another, he is guilty of an unlawful publication of it. (*Moore,* 813. 4 *Bac. Abr.* 458. 1 *Hawk. P. C.* b. 1. c. 73. s. 8.) To apply this rule, then, to the facts appearing on the record. The defendant, as one of the meeting, adopted the address, and ordered it to be published. It was afterwards printed by *James Cheetham.* Here was a publication to him at least. Again, in the case of *The King* v. *Bear,* (2 *Salk.* 419. 1 Ld. *Raym.* 416.) it is laid down, that when a libel appears under a man's own hand-writing, it is, *prima facie,* evidence of

his being the author. The defendant's name appears to the copy of the libel, the original of which he admits he ordered to be published. His name must be presumed to have been put to the original, by him or by his direction. The sale of a libel by a servant in a shop, has been held, *prima facie*, evidence of a publication by the master. (5 *Burr*. 2688.) And the giving of a bond to the stamp-office, for the duties on the advertisements in a newspaper, and occasionally applying at the stamp-office respecting the duties, was held sufficient to charge such person with being the publisher. (4 *Term Rep*. 126.) If such circumstances are sufficient evidence of publication, how can it be pretended, that where the defendant's name appears to the libel, and he admits that he had ordered it to be published, and that it had actually been printed, yet still there was no publication. It appears to me, that the facts spread upon this record afford irresistible evidence that the defendant had acknowledged the publication of the libel. (2 *M'Nally*, 642.)

3. The third question raised is, that there is no evidence of express or implied malice.

Where the act is in itself unlawful, the proof of justification or excuse lies on the defendant; and on failure thereof, the law implies a criminal intent. (5 *Burr*. 2667. 4 *Term Rep*. 127.) If a libel contains an imputation of a crime, or is actionable, without showing special damage, malice is, *prima facie*, implied; and if the defendant claims to be exonerated, on the ground of want of malice, it lies with him to show it was published under such circumstances, as to rebut this presumption of law. (1 *Term Rep*. 110.) The manner and occasion of the publication have been relied on for this purpose, and in justification of the libel. It has not been pretended but that the address in question would be libellous, if considered as the act of an individual; but its being the act of a public meeting, of which the defendant was a member,

and the publication being against a candidate for a public office, have been strenuously urged as affording a complete justification. The doctrine contended for by the defendant's counsel, results in the position, that every publication, ushered forth under the sanction of a public political meeting, against a candidate for an elective office, is beyond the reach of legal inquiry. To such a proposition I can never yield my assent. Although it was urged by the defendant's counsel, I cannot discover any analogy whatever between the proceedings of such meetings, and those of courts of justice, or any other organized tribunals known in our law, for the redress of grievances. That electors should have a right to assemble, and freely and openly to examine the fitness and qualifications of candidates for public offices, and communicate their opinions to others, is a position to which I most cordially accede. But there is a wide difference between this privilege, and a right irresponsibly to charge a candidate with direct, specific and unfounded crimes. It would, in my judgment, be a monstrous doctrine to establish, that when a man becomes a candidate for an elective office, he thereby gives to others a right to accuse him of any imaginable crimes, with impunity. Candidates have rights, as well as electors; and those rights and privileges must be so guarded and protected, as to harmonize one with the other. If one hundred or one thousand men, when assembled together, undertake to charge a man with specific crimes, I see no reason why it should be less criminal than if each one should do it individually, at different times and places. All that is required, in the one case or the other, is, not to transcend the bounds of truth. If a man has committed a crime, any one has a right to charge him with it, and is not responsible for the accusation; and can any one wish for more latitude than this? Can it be claimed as a privilege to accuse, *ad libitum*, a candidate with the

most base and detestable crimes? There is nothing upon the record showing the least foundation or pretence for the charges. The accusations, then, being false, the *prima facie* presumption of law is, that the publication was malicious; and the circumstance of the defendant being associated with others, does not, *per se*, rebut this presumption. How far this circumstance ought to affect the measure of damages, is a question not arising on the record. It may, in some cases, mitigate, in others enhance them. Every case must necessarily, from the nature of the action, depend on its own circumstances, which are to be submitted to the sound discretion of the jury. It is difficult, and perhaps impracticable, to prescribe any general rule on the subject. We mean, therefore, to confine ourselves to the questions before us; and upon the last point only say, that the facts appearing upon the record do not amount to a justification of the libel.

The plaintiff must accordingly have judgment.

Judgment for the plaintiff.