Allen, J.
I am of opinion, that the decree in this case should be reversed and the bill dismissed.
It is an application for the specific execution of a contract alleged to have been made with the appellee, or with him and his wife, by his mother-in-law mrs. Gray. Judge Carr, in Anthony v. Leftwich, 3 Rand. 245. says, “ Every bill calling for the exercise of this extraordinary jurisdiction of equity, is an application to the sound discretion of the court. It is not a case requiring the interposition of the court ex debito justitice, but rests in then discretion, upon all the circumstances.” And among the objections which he enumerates to the interference of the court, were, 1. the uncertainty of the agreement; and 2. the time suffered to elapse before the filing of the bill. Both apply with great force in this case. To which may be added the complete change of circumstances in the situation of the parties before the bill was filed.
The agreement relied on is contained in a letter from mrs. Gray to the appellee and his wife, dated the 19th October 1816. It was not written by mrs. Gray, who was an illiterate woman, and, upon its face, is manifestly the production of a most unskilful draftsman. The witness.Hutchings deposes, that he wrote it in pur *77 suance of the instructions of mrs. Gray: but it is very doubtful, whether a writing drawn up by one so unaccustomed to write, could be relied on as expressing her real intentions. It is proved by the witness Lovell, that not long after the date of this letter, the appellee shewed him two letters from mrs. Gray, one of which (said to be lost) purported to give the views of mrs. Gray more fully than the letter filed. Another witness, Sally Owens, proves, that she was present at a conversation between the appellee and mrs. Gray, when he was in Virginia, on a visit from Kentucky, the time when the agreement was made, which is referred to in the letter of the 19th October 1816. In this conversation, mrs. Gray told the appellee to inform her daughter, what she intended to do for her if they returned, but added, that the appellee should not himself be one dollar the better thereby, as he had spent too much of her money already. From this evidence, it appears the plaintiff was in possession of another letter, which he has not produced, and which, according to the evidence of Lovell, set out the agreement more fully than the letter he has produced; but what that agreement was we know not. And the evidence of Owens, confirmed by the whole current of the proofs, even by the letter of the 19th October 1816, shews, that the daughter was the object of the mother’s bounty: it was for her she intended to provide ; and she did not contemplate any provision for the appellee distinct from her. It was contended in argument, that the letter contained either a promise to give the land to the husband, or to the husband and wife. I think the promise was intended for the wife alone, especially when the letter is taken in connection with the other proofs in. the case'. But the uncertainty which rests upon the character of the promise, is of itself a strong objection to the relief prayed; and this uncertainty, taken in connection with the circumstances, that the letter was not written by mrs. Gray, but by ano *78 ther person who may have misapprehended her views, and that another letter was written stating the terms of the contract more fully, and perhaps differently, which letter is not produced, furnishes to my mind an insurmountable obstacle to the exercise of the jurisdiction of a court of equity decreeing a specific execution.
Then, as to the time; the letter is dated in October 1816. The .appellee returned to Virginia in January .1817. He remained with mrs. Gray that year; they quarrelled and separated; controversies arose between them; a suit was instituted against him by mrs. Gray, for a large sum she had lent him, which was settled by arbitration. All this occurred many years before mrs. Grafs death; and this.suit was not commenced until November 1828. There was no reason for such long delay. “ It is laid down generally,” says judge Carr, (in Anthony v. Leftwich) “ that he who comes for a specific execution, must not sleep on his case, but come recently. Time is pretty certain to operate a change in the circumstances of the parties, and the situation of the subject matter of the contract. It destroys evidence ; it cuts off the parties to the transaction; and then successors know not how to explain what they might have made perfectly clear.” All this has occurred in the present instance. Mrs. Gray is dead: her daughter, the object of her solicitude, is dead; evidence which is shewn to have once existed is lost, or perhaps withheld; and the property has been disposed of to another. There could have been no considerations of good will or friendship, which restrained the appellee from asserting his rights at an earlier period, for they had differed and were at law. Such gross negligence, if there were no other objection, should prevent the interference of a court of equity.
And in the last place, there has been an entire change in the circumstances of the parties. Mi’s. Corder is dead. Mrs. Grafs promise was made to provide her with a *79 home. The evidence shews she did not contemplate * any permanent provision for the appellee, except so far as he might be benefited by the provision for his wife. To permit him now to assert the contract, would, under the changed condition of the parties, violate the intention of the party by whom the promise was made.
As to the slave Charity and her increase: there are two objections to the relief granted, either of which is decisive. To constitute a valid parol gift of slave property, there must be a delivery. Here no delivery was made ; the slave never left the possession of the donor. It was nothing but a promise to give, and being without consideration never could be enforced. In the second place, if there had been a delivery, the slave was instantly returned and continued in possession of mrs. Gray until her death; and though the bill avers a demand, and her refusal to give her up, no suit was brought for more than ten years after the alleged gift. In the mean time, mrs. Gray sold one of the slaves, and she died in possession of the other two. If the appellee ever had a claim, it is barred by the statute of limitations, which is relied on in the answer.
Cabell and Brooke, J. concurred.
Tucker, P.
Whether the evidence in this record establishes any claim against the appellant or not, it is apparent, that, upon legal principles, this decree can never be supported. The bill sets up one claim, the testimony goes to prove another, and the decree is for a third. The bill alleges a promise to give one third of the estate which mrs. Gray had a right to dispose of, to the plaintiff, Corder ; the letter produced as evidence of the contract, goes to prove, that mrs. Gray had promised not one third of her estate, but 200 acres of land definitively, and this was to be given not to Corder himself but to his wife ; and the decree is for a life estate *80 to Corder in the 200 acres of land. These discrepancies are fatal to the case, unless we discard at once those principles which require the proofs to correspond with the demand, and the relief afforded to he consistent with both. If, then, there were nothing more in the case, I should be of opinion to reverse the decree and dismiss the plaintiff’s bill.
But the objections to his case are yet more radical. Whether we consider the paper called the contract, or its reasonableness, or the consideration of it, or the performance on his part by Corder, or his delay in asserting his rights, or the evidence afforded by that delay of abandonment, we must come to the conclusion, that this is no case for specific execution.
With respect to the letter itself, which is introduced by the bill of review, and which supersedes all the oral testimony as to the contract, I am of opinion, that it ought not to be taken to be, in itself, a contract binding mrs. Gray. I have always thought, that the loose dicta-of some of the judges in Rowton v. Rowton, I Hen. &. Munf. 91. were calculated to give rise to claims on the part of children and sons-in-law, to conveyances, upon pretended contracts, sustained by evidence of loose family conversations or correspondence, and of abandonment of imaginary profits in consideration of the promise of a title to real estate. I have always thought there was much good sense in the remark of chancellor Kent, “ that it would be injurious to that freedom of intercourse, and, to the operation of those kind and generous affections which ought to be cherished in the circle of domestic connexions, to deduce a truth from loose and general expressions in a confidential correspondence, between one member of a family and another, and to give them the force of legal obligations.” 5 Johns. 13. What parent could address a letter to his child in the free and unreserved language of affection, if he is to be trepanned into a contract by every expression of favourable inten *81 tions towards his offspring ? What parent, in the use of such expressions, means any thing more, than to indicate that, in the exercise of his own free will—in the fulfilment ex mero motu of his parental obligations to provide for his child—it is his purpose to make a particular provision. What parent, by such language, conceives himself tied down by an obligatory contract, for which he has received not a stiver, merely upon the pretence that his son has given up some scheme of fancied profit to gratify a father’s wishes? The natural interpretation of all such transactions is the reverse of this. If I were even to propose distinctly to my son-in-law, that if he would leave the place in which he resides and settle my daughter near me, I would give her a particular estate, it might, nevertheless, admit of doubt, whether without some definitive arrangement, the parties would have an obligatory claim upon me, or must look altogether to the exercise of my untrammeled discretion in the bestowal of this gratuity. The latter would be the fair inference, at least where instead of assorting their rights in my lifetime they lie by till my death, depending upon my voluntary act, and setting up no pretence to bind me until the grave has closed upon me and on their hopes. It is then too late to demand from my justice what in my lifetime they had looked to only from my affection and munificence. The ordinary principles which require promptness in the assertion of the right to specific performance, apply with peculiar force, where no consideration is given, and where from that circumstance there is always reason to doubt, whether there was any intention in the parent to bind himself irrevocably by contract.
In the present case, indeed, there are strong expressions which have been relied on to prove there was a contract. Mrs. Gray says, that Corder and herself made “ a bargain.” But, besides that this form of expression, in familiar use, does not always mean a technical con *82 tract, it would be going far indeed, to take this most inar^£cjgj letter, of a woman who could not write, written by a scribe who could not spell, and the terms of which are not defined, to be a contract binding her absolutely, without consideration save love and affection, to convey the whole of the land she had to dispose of, to her daughter, when she had three sons, or their descendants, to provide for. Add to this, that in the bill itself, and in the evidence of various witnesses, it is stated, that mrs. Gray was to convey one third only of what her second husband left her, and not the 200 acres (which was all the land in which she had a fee under his will); and we may well question, whether this paper contains the true understanding of the parties. But every doubt is removed, when we see that she promises “ to write another letter in full in a short time,” and when we find that she did write another letter, which explained her views more fully, and which the plaintiff has not produced. Whether he has suppressed it, or has not taken care of it, because he looked upon neither of the letters as of any importance, it is not necessary to enquire. On the ground, therefore, that it does not satisfactorily appear- that this letter does contain the real contract of the parties, if any, and that it is of itself doubtful and uncertain, I should be clearly of opinion to deny the relief asked by the bill, or that given by the decree.
There are, however, other vital objections to the plaintiff’s case. What was the consideration of this pretended contract ? There was none moving to her, except affection for her child; and it is therefore attempted to supply the want of it, by his pretended losses and sacrifices in the sale of his property in Kentucky. His property consisted of little more than two wagons and two teams; and there is no proof that these were sacrificed. What adequate consideration then was there for the conveyance of a tract of 200 acres of land and other *83 property ? It is said he sacrificed his prospects. What those prospects were, does not appear. From his past successes, they could not have been very flattering. But be this as it may, a decree for specific performance, being a matter of discretion, a court of equity will never make it, where the consideration is inadequate, but will leave the party to his action for damages for the breach of the contract. And this is the more proper, where the contract was in its origin unreasonable, where the lapse of time and change of circumstances have rendered it more so, where the evidence of performance on his part by the plaintiff is at least unsatisfactory, and the presumption of his abandonment of title, if he ever imagined he had any, is well nigh conclusive. Was it reasonable, in the first instance, that mrs. Gray should have promised to give to her daughter and son-in-law, the whole of her disposable lands, when she had sons and grandchildren having equal claims upon her affections ? Was it reasonable, that she should be compelled to do so for the imaginary sacrifices made by her son-in-law in his property and his prospects? and this too, without any security provided by the contract, that as soon as he had got the title he would not sell the property and move out again to the west ? Was it reasonable to enforce the contract in favour of Corder when the main objects of mrs. Gray, the desire, namely, of her daughter’s society, and of his services in her family, were frustrated by the quarrel between them in a few months, arising as it seems to me from his own misconduct? And would it now be reasonable, after the death of mrs. Gray, and of her daughter, and the laches of the plaintiff, to assert his claim until ten or or twelve years had elapsed, and the other contracting party was in her grave ? I think not, and have no hesitation in saying that as to the land, the decree should be reversed and the bill dismissed.
*84 I am also of the same opinion as to the slaves, for the reasons so well presented by my brother Allen in his views of the plaintiff’s pretensions.
Decree reversed, and bill dismissed.