DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ELIZABETH ALEXANDER,** et al.,
Appellant,

v.

**PRESIDENT DONALD J. TRUMP,**
Appellee.

No. 4D2024-1983

[February 12, 2025]

Appeal of a nonfinal order from the Circuit Court for the Nineteenth Judicial Circuit, Okeechobee County; Robert L. Pegg, Senior Judge; L.T. Case No. 472022CA000246.

Charles D. Tobin, Chad R. Bowman, and Maxwell S. Mishkin of Ballard Spahr LLP, Washington, DC, and Paul R. Berg of Whitebird, PLLC, Vero Beach, for appellant.

Jeremy D. Bailie, Timothy W. Weber, and R. Quincy Bird of Weber, Crabb & Wein, P.A., St. Petersburg, for appellee.

KUNTZ, J.

President Donald J. Trump, a Florida resident, sued nineteen individual members of the Pulitzer Prize Board, an unincorporated association, for defamation and conspiracy. Trump alleged that he sent letters on his personal letterhead to members of the Pulitzer Prize Board. The letters demanded the Pulitzer Prize Board take action to strip The Washington Post and The New York Times of the Pulitzer Prize awarded in 2018 for articles on purported Russian interference in the 2016 presidential election and alleged connections to Trump.

After Trump sent the letters, the Pulitzer Prize Board met remotely and concluded "no passage or headlines, contentions or assertions in any of the winning submissions were discredited by facts that emerged subsequent to the conferral of the prizes." The Board then issued the following statement on its website, with links to the original articles:

**A Statement from the Pulitzer Prize Board**

The Pulitzer Prize Board has an established, formal process by which complaints against winning entries are carefully reviewed. In the last three years, the Pulitzer Board has received inquiries, including from former President Donald Trump, about submissions from The New York Times and The Washington Post on Russian interference in the U.S. election and its connections to the Trump campaign--submissions that jointly won the 2018 National Reporting prize.

These inquiries prompted the Pulitzer Board to commission two independent reviews of the work submitted by those organizations to our National Reporting competition. Both reviews were conducted by individuals with no connection to the institutions whose work was under examination, nor any connection to each other. The separate reviews converged in their conclusions: that no passages or headlines, contentions or assertions in any of the winning submissions were discredited by facts that emerged subsequent to the conferral of the prizes.

The 2018 Pulitzer Prizes in National Reporting stand.

This statement led to Trump's lawsuit. But this appeal does not require us to address the merits of Trump's conspiracy and defamation claims. Instead, we focus on the personal jurisdiction issue raised by a motion to dismiss Trump's amended complaint. Of the nineteen defendants sued by Trump, only one resides in Florida. The remaining eighteen moved to dismiss the case for lack of personal jurisdiction. The eighteen defendants argue they did not commit a tortious act and did not direct the statement into Florida. Trump, and the circuit court, disagreed.

This challenge to personal jurisdiction does not require us to navigate uncharted waters. The law relating to personal jurisdiction is well established, and we are bound to follow it. As the Florida Supreme Court recently wrote:

> There are two requirements for a nonresident defendant to be subject to personal jurisdiction in Florida. First, the complaint must allege sufficient jurisdictional facts to bring the defendant within the scope of Florida's long-arm statute, section 48.193, Florida Statutes (2019). *See Venetian Salami* [*Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989)]. Second,

2

> there must be sufficient minimum contacts between the
> defendant and Florida to comply with the Due Process Clause
> of the United States Constitution. *See id.*

*Mitchell v. Race*, 396 So. 3d 209, 210 n.1 (Fla. 2024).

Deposition testimony was presented that the statement was issued because "questions were being raised" and, because of those questions, the Pulitzer Prize Board decided it "should have a public response." Deposition testimony also showed that a draft version of the statement was reviewed for editing by a member of the Pulitzer Prize Board living in Florida who reviewed the draft while in Florida. Once finalized, the statement was published on the Pulitzer Prize's website.

The circuit court concluded that the exercise of personal jurisdiction over the eighteen defendants was proper. We agree. Trump's operative pleading sufficiently pled that the defendants engaged in a conspiracy to defame him. Further, the defendants issued the website public statement in response to the requests of a Florida resident—Trump. They did so in a meeting attended remotely by a Florida resident who also conducted an editing review of the proposed website statement while in Florida.

Because Trump met the personal jurisdiction requirements of Florida's long arm statute and the Due Process Clause, the circuit court's order is affirmed.

*Affirmed.*

CONNER and ARTAU, JJ., concur.
ARTAU, J., concurs with an opinion.

ARTAU, J., concurring.

"FAKE NEWS." "The phony Witch Hunt." And "a big hoax." President Donald J. Trump has publicly used these phrases to describe the now-debunked allegations that he colluded with the Russians to win the 2016 presidential election.[1]

---

[1] Donald J. Trump (@realDonaldTrump), X (Feb. 26, 2017, 1:16 PM) (URL omitted); Donald J. Trump (@realDonaldTrump), X (June 16, 2019, 8:54 AM) (URL omitted); Donald J. Trump (@realDonaldTrump), X (July 22, 2018, 6:23 PM) (URL omitted); *see also* Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 22, 2025, 10:46 AM) (URL omitted) (describing these allegations as the "Russia HOAX").

As noted in the President's complaint, Special Counsel Robert Mueller, Attorney General William Barr, the House of Representatives' Permanent Select Committee on Intelligence, and the United States Senate's Select Committee on Intelligence all concluded "there was no evidence of collusion between President Trump, the Trump Campaign, and Russia." In other words, as the President asserts, "[t]he Russia Collusion Hoax was dead, at least until Defendants [as members of the Pulitzer Prize board] attempted to resurrect it" by conspiring to publish a defamatory statement falsely implying that the President colluded with the Russians.

I join the unanimous majority opinion because I agree that Florida's long-arm statute and the Fourteenth Amendment's Due Process Clause allow for the exercise of personal jurisdiction over the non-resident defendants for their alleged roles in conspiring to issue the defamatory statement standing by the debunked allegations that the President colluded with the Russians. But I write separately to address the merits of the President's defamation and conspiracy claims because the non-resident defendants challenge them here by arguing that they are not actionable under Florida's long-arm statute. Thus, the merits of the President's claims are crucial to our jurisdictional analysis and will be addressed in this opinion.

### Jurisdictional Analysis

This court is required to review de novo the trial court's decision to deny the motion to dismiss for lack of personal jurisdiction. *NHB Advisors, Inc. v. Czyzyk*, 95 So. 3d 444, 447 (Fla. 4th DCA 2012).

Here, the trial court correctly concluded that it had personal jurisdiction over the non-resident defendants because the President satisfied his twofold burden to (1) bring the action under Florida's long-arm statute (statutory prong), and (2) establish that the non-resident defendants had sufficient minimum contacts with Florida under the conspiracy theory of jurisdiction (constitutional prong). *See id.* at 447-48 (explaining the two-part test for personal jurisdiction).

### Statutory Prong

Under Florida's long-arm statute, personal jurisdiction exists over a defendant if he or she "[c]ommit[s] a tortious act within this state." § 48.193(1)(a)2., Fla. Stat. (2022). In the context of defamation, "[a] nonresident defendant commits the tortious act of defamation in Florida for purposes of Florida's long-arm statute when the nonresident makes allegedly defamatory statements about a Florida resident by posting those

4

statements on a website, provided that the website posts containing the statements are accessible in Florida and accessed in Florida." *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1216 (Fla. 2010).

The non-resident defendants here do not dispute that the website statement about the President, a Florida resident, is readily accessible in Florida, and has been accessed in Florida. Instead, they dispute the merits of the President's claims by arguing that the statement at issue is not actionable under the long-arm statute because it constitutes pure opinion, rather than a defamatory statement of fact or mixed opinion. The non-resident defendants also argue that even if the statement was not one of pure opinion, it did not create a false impression about the President.

For a statement to be actionable in defamation, it must be one of fact or mixed opinion rather than simply a statement of pure opinion. *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106-07 (Fla. 2008); *see also Zambrano v. Devanesan*, 484 So. 2d 603, 606 (Fla. 4th DCA 1986) (explaining that while statements of mixed opinion are actionable in defamation, statements of pure opinion are not because they are protected under the First Amendment).

This court has explained the difference between pure opinion and mixed opinion as follows:

> According to the Restatement . . . a mixed opinion "is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication." It differs from pure opinion which is "[a] simple expression of opinion based on disclosed or assumed nondefamatory facts[.]"

*Zambrano*, 484 So. 2d at 606 (alterations in original) (quoting *Rand v. N.Y. Times Co.*, 75 A.D.2d 417, 422, 430 N.Y.S.2d 271, 274 (N.Y. App. Div. 1980)) (discussing Restatement (Second) of Torts § 566 cmts. b & c (Am. Law Inst. 1965)). Conversely, a statement of fact is one that describes "[a]n actual or alleged event or circumstance." *Fact*, Black's Law Dictionary (12th ed. 2024).

Moreover, the recognized tort of "[d]efamation by implication arises, not from what is stated, but from what is implied when a defendant '(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication[.]'" *Jews for*

5

*Jesus*, 997 So. 2d at 1106 (alterations in original) (quoting *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007)).  In short, even a literally true statement is actionable if it "create[s] a false impression."  *Id.*

The statement here was actionable as one of fact because it detailed both the procedure the Pulitzer Prize board members followed to conclude that they would not rescind the 2018 Pulitzer Prizes in National Reporting and the reasoning for not rescinding the awards.  The statement described "[a]n actual or alleged event or circumstance[,]" with the board members vouching for the truth of facts that had been debunked after thorough investigation, thereby rendering it a statement of fact.  To the extent any part of the statement could be considered opinion in form or context, the statement was nonetheless actionable as a mixed opinion with implied facts.

Furthermore, the statement constitutes defamation by implication because, as the complaint asserted, despite the fact that "[t]he awarded organizations had reported the individual components of the Russia Collusion Hoax all wrong[,]" which "were exposed as utter fiction[,]" the Pulitzer board members published a statement falsely implying that these facts were true by stating that two independent reviews conducted by individuals at their request concluded "that no passages or headlines, contentions or assertions in any of the winning submissions were discredited by facts that emerged subsequent to the conferral of the prizes."  In other words, the board members vouched for the truth of reporting that had been debunked by all credible sources charged with investigating the false claim that the President colluded with the Russians to win the 2016 presidential election, including Special Counsel Robert Mueller, Attorney General William Barr, the House of Representatives' Permanent Select Committee on Intelligence, and the United States Senate's Select Committee on Intelligence.

Therefore, because the statement at issue was one of fact or mixed opinion, and constitutes a claim for defamation by implication, Florida's long-arm statute allows for the exercise of jurisdiction.[2]

## Constitutional Prong

"[T]he Due Process Clause 'does not contemplate that a state may make

---

[2] As the President asserts, the statement may also be actionable as defamation per se.  However, we need not address whether the statement is actionable as defamation per se because either claim of defamation would constitute a tortious act subject to jurisdiction under Florida's long-arm statute.

binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.'" *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Rather, it gives defendants "fair warning that a particular activity may subject [them] to the jurisdiction of a . . . sovereign[.]" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (first alteration in original) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment)).

There are two types of personal jurisdiction a court can constitutionally exercise over a defendant: (1) general jurisdiction and (2) specific jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014). General jurisdiction is established by the defendant's domicile, i.e., his "physical presence in [the] place" where he intends to remain indefinitely. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). In contrast, specific jurisdiction is based on the defendant's "minimum contacts" with the forum, including the "relationship among the defendant, the forum, and the litigation[.]" *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Shaffer*, 433 U.S. at 204 (majority opinion)).

However, as Justice Alito noted in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021), "there are grounds for questioning the standard that the Court adopted in *International Shoe Co. v. Washington*[.]" *Id.* at 372 (Alito, J., concurring). This is because, as Justice Gorsuch explained in a separate concurrence, the standard established in *International Shoe* and its progeny is inconsistent with the common law's understanding of due process. *See id.* at 379 (Gorsuch, J., concurring).

At common law, "due process was usually understood to guarantee that only a court of competent jurisdiction could deprive a defendant of his life, liberty, or property." *Id.* "In turn, a court's competency normally depended on the defendant's presence in, or consent to, the sovereign's jurisdiction." *Id.* However, "once a plaintiff was able to 'tag' the defendant with process in the jurisdiction, that State's courts were generally thought competent to render judgment on any claim against the defendant, whether it involved events inside or outside the State." *Id.*

"[T]he rise of corporations and interstate trade" caused the Supreme Court to deviate from these common law principles in *International Shoe* and its progeny. *Id.* Indeed, "the Court began invoking the Due Process Clause to restrict the circumstances in which an out-of-state corporation could be deemed present." *Id.* at 381. "But critics questioned its fidelity

7

to the Constitution and traditional jurisdictional principles, noting that it often left injured parties with no practical forum for their claims[.]" *Id.*

Thus, whether the Due Process Clause allows a court to exercise jurisdiction over a defendant should be guided by historical common law principles. *See id.* at 384 ("Hopefully, future litigants and lower courts will help us face these tangles and sort out a responsible way to address the challenges posed by our changing economy in light of the Constitution's text and the lessons of history.").

## Conspiracy Theory of Jurisdiction

One theory of jurisdiction that is consistent with both historical common law principles and the minimum contacts test established in *International Shoe* is the conspiracy theory of jurisdiction. *See* Naomi Price & Jason Jarvis, *Conspiracy Jurisdiction*, 76 Stan. L. Rev. 403, 409, 414-18 (2024); *see also* 21 C.J.S. Courts § 63 (2024) ("[T]he conspiracy theory of jurisdiction is viewed as consistent with the requirements of due process.").

The conspiracy theory of jurisdiction's "gist is that acts of a co-conspirator performed in a forum state in furtherance of a conspiracy create sufficient minimum contacts to establish personal jurisdiction over a remote co-conspirator, even when that co-conspirator had no other direct contacts with the forum state." Price & Jarvis, *supra*, at 409; *see also Hyde v. United States*, 225 U.S. 347, 362 (1912) (explaining that a state court can exercise jurisdiction to punish a conspiracy where it is consummated because there is "*a constructive presence* in a state, *distinct from a personal presence*" (emphasis added)).

While "[c]onspiracy jurisdiction has emerged as a species of specific jurisdiction[,]" it is derived from the common law rules relating to proper venue for prosecutions of criminal conspiracy. Price & Jarvis, *supra*, at 409, 415-16.

"At common law, the venue in conspiracy could be laid in any county in which it could be proven that an overt act was done by *any one of the conspirators* in furtherance of their common design." *Hyde*, 225 U.S. at 365 (emphasis added) (quoting *Robinson v. United States*, 172 F. 105, 108 (8th Cir. 1909)). For instance, "[w]here a conspiracy was formed at sea, and an overt act done in [a particular] [c]ounty, it was held that the venue was properly laid in that county." *Id.* (quoting *Robinson*, 172 F. at 108).

Therefore, because venue was proper at common law in any jurisdiction

in which a co-conspirator committed an overt act, a court can constitutionally exercise personal jurisdiction over all defendants who participated in the alleged conspiracy so long as it can exercise personal jurisdiction over any one of the co-conspirators. *See* Price & Jarvis, *supra*, at 416 ("[V]enue appears to be the best proxy for jurisdiction because the concept of what is a *possible* forum is similar enough to what is the *preferable* forum that a focus on the location where the conspiracy occurred has something useful to tell us about what conspiracy jurisdiction would ultimately become.").

Florida law recognizes the conspiracy theory of jurisdiction. *See Czyzyk*, 95 So. 3d at 448 ("[I]f a plaintiff has successfully alleged a cause of action for conspiracy among the defendants to commit tortious acts toward the plaintiff, and if the plaintiff has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of Florida[.]"); *Amersham Enters., Inc. v. Hakim-Daccah*, 333 So. 3d 289, 296 (Fla. 3d DCA 2022) ("It follows that 'acts of a conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy and that personal jurisdiction over a nonresident co[-]conspirator may be exercised even absent sufficient personal minimum contacts with the forum if those contacts are supplied by another.'" (quoting 21 C.J.S. Courts § 63 (2021))); *see also Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994) (applying the conspiracy theory of jurisdiction under Florida's long-arm statute).

Here, personal jurisdiction can constitutionally be exercised over the non-resident defendants because the President satisfied his burden to show that the non-resident defendants knowingly participated in a civil conspiracy with a resident defendant to defame the President.

The complaint asserted that "the nonresident Defendants knew Defendant [Neil] Brown was a resident of Florida when they willingly participated in a conspiracy with him to defame Plaintiff. Defendant Brown is a prominent figure in American media, leading the St. Petersburg-based Poynter Institute, a non-profit organization that serves the journalism establishment."

The complaint then asserted that, in response to the President's request for the Pulitzer Prize board members to withdraw the 2018 Pulitzer Prize in National Reporting after The Washington Post itself made corrections and deletions to the award winning article, "[t]he Pulitzer Prize board took no immediate public action" but instead "the board—including several Defendants who served on the Pulitzer Prize board at the time—circled the

wagons to discuss, vote on, and authorize another evaluation of the 2018 Pulitzer Prize in National Reporting[.]"

The complaint then went on to assert that "Defendant Daniszewski and Defendant Boo, sitting as co-chairs collaborated closely with Defendant Kliment . . . and with incoming co-chairs Defendant Shelby and Defendant Brown to draft a statement in response to President Trump's letters" and this "statement would eventually be approved for publication by each of the Defendants through a full board vote and become the defamatory statement at issue in this case."

The complaint then further asserted that after the President made another request for the 2018 Pulitzer Prize in National Reporting award to be rescinded, "Defendants again took no public action, but communicated privately, including via phone and email. Defendants Daniszewski, Boo, Kliment, Brown, and Shelby finalized their defamatory statement and presented it to the remaining Defendants for approval prior to publication." The complaint also asserted that following this, "Defendants, as members of the Pulitzer Prize board, were briefed on the smaller group's work and thereafter approved the content and directed the publication of the defamatory statement."

The complaint continued by asserting that "Defendants, with knowledge of its falsity and/or reckless disregard for the truth, published the Pulitzer Statement to include the false implication that there was an established, nefarious connection between Russian attempts to interfere in the 2016 U.S. election, President Trump, and his presidential campaign, when it was crystal clear that no such connection existed" and the President suffered damages from this tort.

Moreover, the evidence submitted to the trial court did not dispel the President's assertion that the non-resident defendants knowingly participated in a civil conspiracy with defendant Brown to defame the President. As the trial court correctly concluded after considering the evidence submitted, the President met his burden to prove that jurisdiction could be exercised over the non-resident defendants.

This is true even though one of the non-resident defendants testified that while the board members knew defendant Brown worked in a leadership role at the Poynter Institute, a non-profit organization in Florida serving the journalism industry, they did not necessarily know that he lived in Florida. But even if the non-resident defendants were unaware of where defendant Brown lived, they knew where he worked. Thus, by knowing that defendant Brown worked and conducted his journalism

10

affairs in Florida, the non-resident defendants necessarily knew defendant Brown was committing overt acts in furtherance of the asserted conspiracy to defame the President in Florida. *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Group PLC*, 22 F.4th 103, 125 (2d Cir. 2021) ("[T]he conspiratorial contacts must be of the sort that a defendant 'should reasonably anticipate being haled into court' in the forum as a result of them." (quoting *World-Wide Volkswagen*, 444 U.S. at 297)).

## Intra-Corporate Conspiracy Doctrine

The non-resident defendants also argue that the conspiracy theory of jurisdiction does not apply to them because they are all members of one Pulitzer Prize board. They argue that under the intra-corporate conspiracy doctrine, members of a board cannot conspire with each other.

However, the non-resident defendants do not contest the fact that the Pulitzer Prize board is an unincorporated association. Because it is an unincorporated association, it is not a separate legal entity from its members. *See Guyton v. Howard*, 525 So. 2d 948, 956 (Fla. 1st DCA 1988) ("[Unincorporated associations] are a legal enigma in Florida. Although we can talk about them, define them, pledge allegiance to them and contribute money to them (often for tax deductions), we cannot sue them. We can only attack their members[.]").

Indeed, "[t]he individual members of an unincorporated association are personally liable for tortious acts they individually commit or participate in, or which they authorize, assent to, or ratify." *Id.* (first citing 6 Am. Jur. 2d, *Associations and Clubs* § 48; and then citing 4 Fla. Jur. 2d, *Associations and Clubs* § 13). In other words, "[a]lthough mere membership in a voluntary association does not make all the members liable for acts of their associates done without their knowledge or approval, a member may be liable . . . [for] the tortious act if he 'sets the proceedings in motion or agrees to a course of action [that] culminates in wrongful conduct.'" *Id.* (internal citation omitted) (quoting *Feldman v. N. Brit. & Mercantile Ins. Co.*, 137 F.2d 266, 268 (4th Cir. 1943)).

Because the intra-corporate conspiracy doctrine "stems from basic agency principles that 'attribute the acts of agents of a corporation to the corporation[] so that all of their acts are considered to be those of a single legal actor[,]'" the doctrine provides that "it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself[.]" *Mancinelli v. Davis*, 217 So. 3d 1034, 1037 (Fla. 4th DCA 2017) (quoting *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000)). Thus, it necessarily follows that the doctrine does not apply to the

11

unincorporated Pulitzer Prize board because it is not a legal entity that the law recognizes as "a single legal actor."  *See id.* (quoting *Dickerson*, 200 F.3d at 767).  To the contrary, "[t]he individual members of [the] unincorporated [board] are personally liable for tortious acts they individually commit or participate in, or which they authorize, assent to, or ratify."  *Guyton*, 525 So. 2d at 956.

Therefore, the intra-corporate conspiracy doctrine does not apply here.  Instead, the conspiracy theory of jurisdiction allows the trial court to constitutionally exercise personal jurisdiction over the non-resident defendants.

### Common Law Defamation: Revisiting *New York Times Co. v. Sullivan*

"Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means[.]" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) (internal citations omitted) (first quoting *Gibbons v. Ogden*, 9 Wheat. 1, 186-89, 6 L.Ed. 23 (1824); and then quoting 1 J. Story, *Commentaries on the Constitution of the United States* § 399, p. 383 (1833)).  This "fixed standard" is "the light of the law as it existed at the time it was adopted[.]" *Mattox v. United States*, 156 U.S. 237, 243 (1895); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 25 (2022) (explaining that the historical and original meaning of constitutional provisions must be applied, "especially [when the] text [is] meant to codify a *pre-existing* right").

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press[.]"  Amend. I, U.S. Const.  This has been incorporated to the states through the Fourteenth Amendment.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).

Because defamation was punishable at common law, it is not protected by the First and Fourteenth Amendments.  *See Beauharnais v. People of State of Ill.*, 343 U.S. 250, 254-58 (1952).  Indeed, "from the founding until 1964, the law of defamation was 'almost exclusively the business of state courts and legislatures.'" *Blankenship v. NBCUniversal, LLC*, 144 S. Ct. 5, 5 (2023) (Thomas, J., concurring in denial of certiorari) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 369-70 (1974) (White, J., dissenting)).

In 1964, however, the Supreme Court held in *New York Times Co. v. Sullivan*, that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official

conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80.

But this standard wrongly applies the First Amendment because it deviates from the common law's standard for libel at the time of the ratification of the First and Fourteenth Amendments. *See Blankenship*, 144 S. Ct. at 5 (Thomas, J., concurring in denial of certiorari) (quoting *McKee v. Cosby*, 139 S. Ct. 675, 678 (2019) (Thomas, J., concurring in denial of certiorari)); *see also Berisha v. Lawson*, 141 S. Ct. 2424, 2425 (2021) (Thomas, J., dissenting from denial of certiorari) ("This Court's pronouncement that the First Amendment requires public figures to establish actual malice bears 'no relation to the text, history, or structure of the Constitution.'" (quoting *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 251 (D.C. Cir. 2021) (Silberman, J., dissenting))). Or, as Justice Gorsuch put it:

> At the founding, the freedom of the press generally meant the government could not impose prior restraints preventing individuals from publishing what they wished. *But none of that meant publishers could defame people, ruining careers or lives, without consequence.* Rather, those exercising the freedom of the press had a responsibility to try to get the facts right—or, like anyone else, answer in tort for the injuries they caused.

*Berisha*, 141 S. Ct. at 2426 (2021) (Gorsuch, J., dissenting from denial of certiorari) (emphasis added).

In fact, the common law recognized a special cause of action, known as *scandalum magnatum* (slander of the nobles), for "[w]ords spoken in derogation of a peer, a judge, or other great officer of the realm[.]" 3 William Blackstone, *Commentaries* \*76. This was considered "more heinous" than ordinary defamation and was "not . . . actionable in the case of a common person[.]" *Id.*

But slander of the nobles did not require any heightened standard of malice to be proved. *See id.*; *see also The Earl of Northampton's Case* (1612) 77 Eng. Rep. 1407, 1408-09 (KB) (stating the elements for slander of the nobles). Instead, the difference between general defamation and slander of the nobles was the status of the person about whom the statement was made. *See* 3 William Blackstone, *Commentaries* \*76.[3]

---

[3] At common law—and as later codified by acts of Parliament—slander of the nobles was actionable both civilly and criminally. James Kent, *Commentaries on*

In *New York Times Co. v. Sullivan*, the Supreme Court deviated from these common law principles "and primarily justified its constitutional rule by noting that 20th century state-court decisions and 'the consensus of scholarly opinion apparently favor[ed] the rule[.]'" *Blankenship*, 144 S. Ct. at 5 (Thomas, J., concurring in denial of certiorari) (first alteration in original) (quoting *Sullivan*, 376 U.S. at 280 & n.20); *see also Counterman v. Colorado*, 600 U.S. 66, 105 (2023) (Thomas, J., dissenting) ("Instead of simply applying the First Amendment as it was understood at the time of the Founding, the Court fashioned its own 'federal rule[s]' by balancing the competing values at stake in defamation suits." (quoting *McKee*, 139 S. Ct. at 676 (Thomas, J., concurring in denial of certiorari) (internal quotation marks omitted))).

However, constitutional analysis should be based on the original historical meaning of the Constitution's text rather than the public policy opinions of scholars. *Cf. Cunningham v. Florida*, 144 S. Ct. 1287, 1287-88 (2024) (Gorsuch, J., dissenting from denial of certiorari) (opining that the Supreme Court wrongly interpreted the right to trial by jury, as guaranteed by the Sixth Amendment, in *Williams v. Florida*, 399 U.S. 78 (1970), when it relied on social science studies instead of the historical definition of a jury).

As Justice Thomas has noted, the actual malice standard's continued use cannot be constitutionally justified, especially when the Supreme Court "has not 'even inquired whether the First or Fourteenth Amendment, as originally understood, encompasses an actual–malice standard.'" *Blankenship*, 144 S. Ct. at 5-6 (Thomas, J., concurring in denial of certiorari) (quoting *Coral Ridge Ministries Media, Inc. v. S. Poverty L. Ctr.*, 142 S. Ct. 2453, 2455 (2022) (Thomas, J., dissenting from denial of certiorari)).

---

*American Law* 2:12-22 (1826). However, truth was a defense only in a civil action because the English believed a slanderous statement of a "noble" to be "equally dangerous to the public peace" regardless of the statement's veracity. *Id.* Thus, it could be said that the criminal action of slander of the nobles was effectually a prior restraint, which, as Justice Gorsuch explained in his opinion in *Berisha*, would violate the First Amendment. *See Prior Restraint*, Black's Law Dictionary (12th ed. 2024) (defining a "prior restraint" as "[a] governmental restriction on speech or publication before its actual expression").

Nonetheless, the existence of the slander of the nobles tort is useful, historical evidence indicating that, at the time of the adoption of the First Amendment, the common law unequivocally did not require a heightened standard of malice to be proved in a civil action when the defamatory statement was targeted at a "noble" or public figure.

In fact, "[t]he common law of libel at the time the First and Fourteenth Amendments were ratified did not require public figures to satisfy any kind of heightened liability standard as a condition of recovering damages." *Id.* at 5 (quoting *McKee*, 139 S. Ct. at 676 (Thomas, J., concurring in denial of certiorari)). For this reason, Justice Thomas explained that the actual malice standard "comes at a heavy cost, *allowing media organizations and interest groups 'to cast false aspersions on public figures with near impunity.'" Id.* (emphasis added) (quoting *Tah*, 991 F. 3d at 254 (Silberman, J., dissenting)).

Nevertheless, unless and until the Supreme Court overturns *New York Times Co. v. Sullivan*, the actual malice standard, which the President sufficiently pled here, must apply. *See Gonzalez v. State*, 982 So. 2d 77, 78 (Fla. 2d DCA 2008) (noting that inferior courts have "no authority to overrule the precedent from the United States Supreme Court"). However, inferior courts can suggest, as I do here, that the Supreme Court revisit whether *New York Times Co. v. Sullivan* should continue to be the law of the land despite historical evidence showing it does not comport with the original understanding of the First Amendment.

**Conclusion**

The President has met his burden of establishing jurisdiction to proceed with his asserted claims that the non-resident defendants acted with actual malice or reckless disregard for the truth by knowingly conspiring with the Florida resident defendant to defame the President by publishing the statement with "[t]he ultimate purpose of . . . resurrect[ing] the debunked Russia Collusion Hoax[,]" when, at the time the statement was issued, "it was abundantly clear to anyone interested in the truth that the Russia Collusion Hoax was utter fiction" and "had been contrived and concocted by malicious partisans[.]"

Therefore, the trial court correctly denied the non-resident defendants' motion to dismiss the President's claims over the asserted publication of defamatory "FAKE NEWS."[4]

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***

---

[4] Donald J. Trump, *supra* note 1.